**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

MICHAEL PITTS,

               *Defendant.*

Criminal Action No. 19-049 (EGS)

---

**REPORT AND RECOMMENDATION OF THOMAS B. MASON**

The Court appointed me to report on and recommend what disciplinary referral, if any, the Court should make as a result of the conduct of former Assistant United States Attorney Nurudeen O. Elias in this case. *See* Minute Order, July 30, 2019 (directing Thomas B. Mason to file a report on "referrals for discipline, if any, related to the conduct outlined in the July 25, 2019 hearing"). I now recommend for the reasons that follow that the Court refer Mr. Elias to the New York State Bar disciplinary authorities for violation of D.C. Bar Rules 3.3(a)(1), 8.4(c), and 8.4(d).

I.    **FACTS**

    A.    **Nurudeen O. Elias**

Nurudeen Elias served as an Assistant United States Attorney for the District of Columbia from July 2014 until he resigned on November 1, 2019. Nurudeen Elias Linkedn Profile (Exhibit 1[1]). He has been a member of the Bar of this Court since at least October 2018. D.D.C. Bar Member/Attorney Search Results (Exhibit 2). Mr. Elias was the sole attorney of

---

[1] This fact is based upon a communication from Mr. Elias through his attorney.

record representing the United States in this matter (aside from the United States of Attorney, who is of record in all criminal cases) from the case's commencement on February 13, 2019 until April 11, 2019.  Docket Entries ("DE") 7, 17, 35.  Prior to Mr. Elias's resignation on November 1, 2019, the government replaced Mr. Elias in the other cases where he was counsel of record in this Court.  *See, e.g.*, Notice of Substitution of Counsel, *United States of America v. John Victor Reed*, Crim. No. 19-cr-093 (EGS) (June 12, 2019).  Mr. Elias does not appear presently to be counsel of record for any party in this Court.

Mr. Elias is a member of the New York Bar, admitted to the Appellate Division, Third Department in 2013.  N.Y. State Attorney Directory (Exhibit 3).  Mr. Elias is not a member of the D.C. Bar or any other state bar.

### B.      The Prosecution of Michael Pitts

The conduct by Mr. Elias that the Court appointed me to review took place during the prosecution of the defendant Michael Pitts in this case.  I recount here the facts that are relevant to Mr. Elias's conduct.

### 1.      Background

District of Columbia police officers arrested the defendant, Michael Pitts, a convicted felon, on January 18, 2019 in Washington, D.C. for unlawful possession of a firearm.  DE 22 at 1 (Mot. to Dismiss).  During a search of the premises where Mr. Pitts was arrested, officers found what they believed to be cocaine base and heroin.  Mr. Pitts was arraigned before the Superior Court of the District of Columbia the next day, but under a District of Columbia practice of sending felon-in-possession gun cases to federal court, *see* DE 39 at 4, prosecutors then also presented the case to a federal grand jury.  That grand jury indicted Mr. Pitts for:

(1) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable By Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. § 922(g)(1);

(2) Unlawful Possession with Intent to Distribute Cocaine Base in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C);

(3) Simple Possession of a Controlled Substance in violation of 21 U.S.C. § 844(a); and

(4) Using, Carrying, and Possessing a Firearm During a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c)(1).

DE 1 (Indictment).

Federal officials then re-arrested Mr. Pitts on February 22, 2019, pursuant to those charges, and on February 27, 2019, this Court released Mr. Pitts pending trial. DE 8 (Order for High Intensity Supervision Program). The Court held a status conference a week later on March 7, 2019, setting April 23, 2019 for jury selection and April 24, 2019 for trial. DE 10 at 1 (Pretrial Order); Minute Entry dated Mar. 7, 2019. The Superior Court charges were dropped on March 11, and only the federal case went forward.

Mr. Pitts made customary discovery requests in response to the federal indictment, including a request for the chemical test results of the alleged illegal drugs found on him when he was first arrested. Just under a month before trial, on March 28, 2019, the Court then held a status conference and directed the government—and specifically Mr. Elias—to provide those test results to Mr. Pitts's lawyer no later than April 8, 2019. Minute Entry dated Mar. 28, 2019; Hr'g Tr. at 7:5–9 (Mar. 28, 2019) (Exhibit 4).

The government did not provide the test results to Mr. Pitts's lawyer by April 8.  As Mr. Elias would later admit, earlier in the case he had provided the alleged drug samples to the District of Columbia Forensic Services ("DFS") for testing, but had forgotten to tell the lab about the Court's March 28, 2019 order directing the government to provide Mr. Pitts with test results by April 8.  *See* DE 46 (Letters of Apology); Hr'g Tr. (July 25, 2019) (Exhibit 8).  While the testing lab was ready and able to timely test the alleged drugs, Mr. Elias's oversight meant that the test results were not available by the Court-ordered deadline.

### 2.      The April 9, 2019 Hearing

The day after the test results were due, April 9, 2019, the Court held a scheduled status hearing.  Not having received the test results, Mr. Pitts moved to exclude any drug evidence from his case.  Hr'g Tr. at 6:20–7:15 (Apr. 9, 2019) (Exhibit 5).  To decide that motion, the Court inquired of Mr. Elias why the test results had not been timely provided.  In response, Mr. Elias made the following statements on the record:

(1)     MR. ELIAS: Yes. And so regarding the DEA records [that is, the drug test records], Your

Honor, the government went back to the DEA after our last -- Actually, it's the DFS, the

District of Columbia Forensic Services -- forensic sciences office. We went back to DFS,

talked to them, told them about the Court's order, that the records should be turned over

by yesterday.

And at that point, they were scrambling because they had a backlog. So one of the things

that happened was they found out that the items itself were not at DFS at the time -- were

not yet at DFS at the time, and so they had to scramble to get it, and they just go the that

[sic], I believe, last Thursday [April 4], and so they are actually working hard to turn -- to

turn out the report before the end of the week [April 12].

4

*Id.* at 6:20–7:7.

(2)    MR. ELIAS: . . . And as Your Honor knows, because of the new -- because of the cases

being brought to the Federal Court and the whole Fifth initiative, there are a lot more of

these cases, both in Superior Court and here in District Court, and the backlog was the

issue for DFS.

*Id.* at 13:5–9.

(3)    MR. ELIAS: And the government told DFS about this court order, and DFS did scramble

to get this together, but there was some issues administratively within DFS that caused

them not to actually --

THE COURT: What sort of issues?

MR. ELIAS: So, I think the real problem was that they had not brought up the evidence

from the Central Evidence Unit before the government -- when the government contacted

them to say, Hey, the Court has ordered you to produce these results by April 8th, and so

you need to get cracking on this right away. And I think -- so by -- and the way the

system works, it took them a couple of days to get that into -- back into the lab and then

get it assigned, and --

THE COURT: A couple of days after -- you informed them, the agency, the day that the

Court ordered --

MR. ELIAS: Yes, Your Honor.

THE COURT: All right. And what date was that?

MR. ELIAS: I believe that was March 27th.

THE COURT: March 27th. All right. And so -- and then what happened?

MR. ELIAS: And so they had to -- So, as I said, I think by the 28th we found out exactly

where the drugs were, and they had to get it up to -- I think I need the assistance of my

calendar to make accurate representations to the Court.

I believe by, like, April 1st or 2nd, the drugs were already back to the lab, and so -- and,

as I said, I believe they also have several, you know, court orders and several deadlines,

and so --.

*Id.* at 13:19–14:16.

(4)     MR. ELIAS: . . . What I said was that on March 27th [sic], because of the Court's order, I

followed up on the -- followed up with the agency to see what the agency was doing and

to alert them to the Court's order.

*Id.* at 19:9–12.

(5)     THE COURT: All right.  I'm not sure what happened after that.  I mean, you spoke with

your agency on the 28th of March, right?

MR. ELIAS: Yes, right, the day the Court ordered it, yes.

THE COURT: And so why did it --

MR. ELIAS: And so that is what I was trying to explain to the Court, that because of the

backlog and the --

THE COURT: But it's a court order.

MR. ELIAS: Yes, Your Honor, and the mixup --

THE COURT: What mixup?

MR. ELIAS: That they did not actually have the drugs in the lab at that time, and so I had

to order -- get it up to the lab and --

THE COURT: But they were aware of the court order, an outstanding court order on

March 28th.

MR. ELIAS: Yes.

THE COURT: All right. At what point did they actually get the drugs?

MR. ELIAS: About April 2nd or 3rd. That is what I said.

*Id.* at 20:8–21:1.

At the conclusion of the April 9th hearing, the Court granted Mr. Pitts's motion, and excluded any drug test evidence from the case. The Court stated, "I'm excluding that evidence. It was a court order. They [i.e., the drug testing lab] can't just sit back and say, we're overworked and we've got too many requests from courts. If they had that problem, they should have filed some sort of motion. No. It's denied." *Id.* at 21:19–23. The government indicated that it would nevertheless proceed on the felon-in-possession gun count (Count I). *Id.* at 21:25–22:1, 22:9–10.

### 3.    The Government's Motion to Dismiss without Prejudice

Although the government sought to move forward on the gun charge against Mr. Pitts, it had apparently not completed testing on that piece of evidence. On April 15, 2019, Mr. Elias moved to dismiss the remaining counts on the indictment without prejudice. That way, the government would have time under the Speedy Trial Act to finish testing the gun before trial was required. DE 22. Mr. Pitts, however, argued that the indictment should be dismissed *with* prejudice, and so the Court took briefing on the matter. *See* DE 22, 23, 27, 31–33. Mr. Elias wrote the government's brief, and in that filing, rather than admit his fault on the drug test issue as he would later do, Mr. Elias wrote that, "[t]he Government was unable to turn over the [drug test] results on April 8, 2019, due to confusion and backlog at the DFS." DE 22 at 2.

Assistant United States Attorney Denise Cheung entered her appearance in the case on April 29, 2019, the day before oral argument was heard on the prejudice issue. She handled the bulk of the ensuing April 30, 2019 hearing on the issue of dismissal with or without prejudice, though Mr. Elias was also present and participated. There is no indication that Mr. Elias made Ms. Cheung aware of his prior misstatements about the drug tests, and Mr. Elias did not correct those prior misstatements at the hearing.[2] Hr'g Tr. at 1:6–7, 73:9–15 (Apr. 30, 2019) (Exhibit 6).

The Court issued a Memorandum Opinion on May 14, 2019 dismissing the indictment with prejudice. DE 38 (Order), 39 (Mem. Op.). As part of its own "Background" section, the Court's Memorandum Opinion recited the facts provided by Mr. Elias regarding the failure to obtain drug test results. DE 39 at 6 ("As for the drug testing results, the government stated that it was unable to turn over the results due to 'confusion and backlog' at the testing agency."). The Court remained unaware of any issue as to the veracity or accuracy of Mr. Elias's statements about why the drug test results were not provided on a timely basis.

### 4.     The Washington Post Inquiry To DFS

Washington Post reporters noticed both the dismissal of Mr. Pitts's case and the Court's statement about a backlog at DFS. They contacted DFS for comment on May 22, 2019. DFS's Director, Jennifer Smith, responded via email, stating that the "backlog" claims were false. The next day, May 23, she wrote the Post that Mr. Elias had asked DFS to have the test results ready by April 15, and added that such results had been completed on April 10 and sent to the government on that date. *See* Spencer S. Hsu and Keith L. Alexander, *Federal prosecutor in*

---

[2] Two other Assistant United States Attorneys were also involved in this case at various points: AUSA Lisa Walters stood in for Mr. Elias at the February 22, 2019 initial appearance, and AUSA Kevin L. Rosenberg entered his appearance on the docket on April 11, 2019. As with Ms. Cheung, there is no evidence that either Ms. Walters or Mr. Rosenberg were aware of the misrepresentations made by Mr. Elias. The circumstances further do not suggest that Ms. Cheung, Ms. Walters, or Mr. Rosenberg had any knowledge of Mr. Elias's misrepresentations. The U.S. Attorney's Office investigation independently confirmed that there is no evidence or indication that Ms. Cheung, Ms. Walters, or Mr. Rosenberg had any knowledge of Mr. Elias's misrepresentations.

*D.C. made 'misrepresentations' to judge, is referred for internal investigation, court records say*, WASHINGTON POST (July 8, 2019) (Exhibit 7).

### 5.    The Government's Disclosures to the Court

On May 23, 2019, the day after the Washington Post inquiry, DFS contacted the U.S. Attorney's office about the representations Mr. Elias had apparently made. *See* Exhibit 8 at 24:24–25:8. The Chief and Deputy Chief of the Criminal Division of the U.S. Attorney's Office in turn wrote that same day to the Court to tell it that "[t]oday, it came to our attention that, during the course of this matter, the government may have provided the Court inaccurate information regarding the status of the drug analysis." DE 42-1 (Letter from T. Patrick Martin to Judge Sullivan). The letter further stated that "[w]e are reviewing the record, and we will advise the Court when our review is complete." *Id.* Then, on May 31, 2019, the government provided the following additional facts to the Court:

> After reviewing the record and undertaking further inquiry into the matter, we have determined that, during the April 9, 2019, Status Hearing, AUSA Elias made misrepresentations to the Court regarding the status of drug analysis in this matter and his purported communications with the D.C.[] Department of Forensic Services (DFS) employees about that topic. Additionally, in the government's Motion to Dismiss [Document No. 22], AUSA Elias reiterated misrepresentations made during the status hearing and mischaracterized DFS's efforts to comply with this Court's order.

> Specifically, AUSA Elias represented that he had communicated with DFS employees regarding the Court's March 28, 2019, Order requiring that the drug analysis in this case be produced by April 8, 2019 (the "Order"). AUSA Elias further claimed that DFS was attempting to comply with the Order but could not produce the report as mandated because of a purported 'backlog' and a failure to transfer the drug evidence to the laboratory. In the government's Motion to Dismiss, AUSA Elias also made misrepresentations regarding purported 'confusion and backlog' at DFS.

> AUSA Elias' representations were false, and during the pendency of this case, he failed to correct the record with the Court. AUSA Elias has admitted that he never communicated with DFS regarding the Order. Additionally, the government has

no information to suggest that DFS had a "backlog" at the time AUSA Elias made that representation to the Court.

DE 45-1 at 1–2 (Email from T. Patrick Martin to Judge Sullivan). The Government also told the

Court that the matter had been referred to the Department of Justice's Office of Professional

Responsibility. *Id.* at 2. On June 28, 2019, the government filed a public Status Report stating,

in relevant part:

> Based on its review of the record, the government has determined that misrepresentations were made to the Court. Specifically, contrary to representations made to the Court: (1) the government never communicated with the D.C. Department of Forensic Services ("DFS") regarding the Court's Order setting a deadline for the production of the drug analysis in this matter, and (2) the government has no information to suggest that DFS had a "backlog" at the time such representation was made to the Court.

DE 42 at 1.

On July 12, 2019, the government filed a response to a minute order entered by the Court

on July 2, 2019. In that response, the government wrote that:

> Where an attorney subject to the U.S. District for the District of Columbia Rules of Disciplinary Enforcement 'has engaged in conduct, which, if substantiated, would warrant the imposition of discipline, the Court may refer that attorney to the U.S. District Court for the District of Columbia Committee on Grievances.['] LCrR 57.27(d)(2). Any decision by the Court about whether a referral is appropriate likely would be better informed after the conclusion of the Department [of Justice's] review.

DE 45 at 2 (footnote omitted).

### 6.    The July 25, 2019 Hearing

On July 25, 2019, the Court held a hearing regarding Mr. Elias's statements and his

compliance with the Court's March 28, 2019 Order. The government was represented by Ms.

Cheung and the Deputy Chief of the Criminal Division. Defense counsel for Mr. Pitts was also

present. Exhibit 8.

Jennifer Smith, Director of the D.C. Department of Forensic Services, attended and provided information to the Court. Ms. Smith stated on the record that the first request to test the seized materials came on February 13 through a paralegal at the U.S. Attorney's Office, with a due date of April 11. *Id.* at 13:9–12, 14–18. The materials to be tested arrived at the laboratory on February 25. *Id.* at 13:19–20. On March 26, DFS received another email from the government paralegal indicating that the testing was to be expedited with a due date of April 15. *Id.* at 13:20–23. On April 9, DFS received a further email checking on the status of the testing. *Id.* at 13:24–25. The DFS examiner responded on April 10, and on the same day uploaded the test reports to the MPD and U.S. Attorney's Office's portal. *Id.* at 14:6–8. Ms. Smith stated that DFS "had no communication about the hearing on March 28th nor the requirement for the evidence to be processed by the April 8th date. We had no discussion with them on that or the need to do that." *Id.* at 14:9–12. Ms. Smith stated that DFS could have made the April 8th deadline "had [it] known." *Id.* at 14:16–20.

### 7.    Mr. Elias's Letters of Apology

Mr. Elias wrote letters of apology to the Court, to Ms. Smith of DFS, and to defense counsel, which were dated July 24, 2019, and filed in the record on July 30, 2019. Letters of Apology (Exhibit 9). In each, he stated that he had made misrepresentations regarding the drug tests. He wrote to defense counsel that "there was no backlog at the Department of Forensic Sciences. I failed to follow up in a timely fashion . . . During the hearing, I made misstatements rather than face the consequences of my actions." *Id.* at 2. He wrote Ms. Smith: "I was unaware of any backlog at DFS and should not have made that misrepresentation." *Id.* at 3. He wrote the Court that he "forgot to inform the Department of Forensic Sciences that the Court had ordered production of the lab result on or before April 8, 2019 and I did not follow up with the lab . . . I

11

went into Court on April 9, 2019, with the intention of admitting to my oversight.  When I

realized that counsel for the defendant rightfully was seeking to exclude the evidence, I panicked

and made a series of representations."  *Id.* at 4.

### 8.   Government Status Reports

The Court ordered the government to file status reports regarding the "progress of the

OPR investigation" every thirty days.  Minute Order dated July 30, 2019.  The Court also

ordered the government to make a filing "to address the issue of the public right to know the

outcome of the investigation and OPR's recommended sanction."  Minute Order dated July 31,

2019.  The government has made a series of sealed filings in response to these Orders and I have

considered the contents of those filings.  The current status is that OPR has completed its

investigation and issued its report.[3]

## II.   The Applicable Disciplinary Procedures and Standards

### A.   This Court

Mr. Elias is a member of the Bar of this Court and therefore is subject to its disciplinary

jurisdiction.  Rules of D.D.C., LCrR 57.23(b) (Exhibit 10) (applying Rules of Disciplinary

Enforcement apply to all attorneys "admitted to membership in the Bar of this Court . . . and to

all attorneys who appear before this Court or who participate in proceedings, whether admitted

or not").  This Court has promulgated rules of disciplinary enforcement pursuant to "its inherent

power and responsibility to supervise the conduct of attorneys" admitted to practice before the

Court or who appear before the Court.  *Id.* at 57.23(a).

The primary mechanism through which this Court sanctions attorneys who violate ethics

rules is by referral to the Court's Committee on Grievances.  That body "receive[s],

---

[3] I have not reviewed the OPR Report.

investigat[es], consider[s] and act[s] upon complaints against attorneys" subject to the Court's

jurisdiction.  Rules of D.D.C. LCrR 57.25(b).  A judge of the Court can refer an attorney, via a

Complaint, to the Committee based on "conduct which, if substantiated would warrant the

imposition of discipline." *Id.* at LCrR 57.27 (d)(2).  The Committee then investigates the matter,

"unless the Complaint is insufficient on its face to warrant investigation." *Id.* at LCrR

57.27(d)(3).  The Committee can conduct the investigation itself, with subpoena power for books

and records and the authority to seek information from a respondent, either informally or through

a formal Answer.  *Id.*  The Chair of the Committee may constitute a three-person Subcommittee

of Inquiry to investigate and recommend whether charges should be brought.  *Id.* at LCrR

57.27(d)(5).  If the Subcommittee recommends that charges be brought and a majority of the

Committee concurs, then the Committee draws up charges for submission to the Disciplinary

Panel of this Court, comprised of three judges.  *Id.* at LCrRs 57.27(d)(7) and 57.24(a).[4]  The

Disciplinary Panel then holds a hearing where a member of the Committee on Grievances

prosecutes the matter.  *Id.* at LCrR 57.27(d)(8).  If the Disciplinary Panel finds that the charges

are "sustained by clear and convincing evidence, [it] may reprimand, censure, suspend, disbar or

otherwise discipline the respondent." *Id.*

If Mr. Elias is disciplined by this Court, he would be required to notify the New York

State Third Department and its Committee on Grievances of such discipline with 30 days.  22

NYCRR § 1240.13(d).  New York would in turn discipline Mr. Elias unless the procedures used

by this Court were shown not to comply with due process requirements, the proof of a violation

---

[4] The Local Criminal Rules provide that the Committee may refer the matter to the D.C. bar authorities. Local Criminal Rule 57.27(d)(3). However, those authorities lack jurisdiction over Mr. Elias. District of Columbia Bar Rule XI(a) limits the disciplinary jurisdiction of the D.C. bar authorities to members of the D.C. Bar and those appearing pro hac vice in a court "of the District of Columbia." Mr. Elias is not a member of the D.C. Bar, this Court is not a court "of the District of Columbia," and he did not appear pro hac vice in this Court in any event.

was "insufficient," or the imposition of discipline "would be unjust." 22 NYCRR § 1240.13(c).

No *de novo* proceeding would occur, but Mr. Elias would have an opportunity to show that the

above circumstances applied to his discipline by this Court. 22 NYCRR § 1240.13(b).

**B.  New York**

Mr. Elias has his sole state license to practice law from the New York Bar, Third

Department. Exhibit 3. The New York disciplinary authorities thus have jurisdiction over Mr.

Elias, even though his conduct occurred outside of that state. N.Y. Rules of Prof'l Conduct r.

8.5(a) ("A lawyer admitted to practice in this state is subject to the disciplinary authority of this

state, regardless of where the lawyer's conduct occurs."). Disciplinary action by this Court

would not prevent the New York bar authorities from imposing discipline. *Id.* ("A lawyer may

be subject to the disciplinary authority of both this state and another jurisdiction where the

lawyer is admitted for the same conduct.").

In addition to or instead of a referral to the Court's Committee on Grievances, this Court

could submit "a written original complaint, signed by the complainant," with the Third

Department Attorney Grievance Committee. 22 NYCCR § 1240.7(a). The Committee and its

Chief Attorney would then conduct an investigation unless the complaint is dismissed after an

initial screening. *Id.* § 1240.7(b), (d)(1). After such investigation, the Committee may dismiss

the complaint, refer it for diversion, issue a private Admonition or, where there is "probable

cause to believe that the respondent engaged in professional misconduct warranting the

imposition of public discipline," the committee will "authorize a formal disciplinary

proceeding." *Id.* § 1240.7(c)(2)(vi). In New York, "public discipline" means either a censure,

suspension, or disbarment. New York Judiciary Law 90(6)(a). To commence formal

disciplinary proceedings for public discipline, the Committee on Grievances files a complaint

with the Appellate Division, which often directs a referee to hear evidence on any disputed facts. 22 NYCCR § 1240.8(a)(1), (b)(1).  Disciplinary proceedings in New York are confidential unless and until the charges are sustained, at which time the complaint and other records become public documents.  *Id.* § 1240.18; N.Y. Judiciary Law 90(10).

If Mr. Elias were suspended for more than 30 days or disbarred by New York, this Court has an abbreviated process for imposing similar discipline.  Rules of D.D.C. LCrR 57.27(c).  In addition, censures or reprimands issued by other authorities are simply noted in the Court's records, *see id.* at LCrR 57.27(c)(6)—though this would not be relevant here because New York does not issue censures or reprimands.  Suspensions of 30 days or less are also simply noted in the Court's records unless "the Committee on Grievances . . . determine[s] that the facts underlying the discipline warrant a proceeding for the imposition of discipline by this Court." *Id.* at LCrR 57.27(c)(1).

### C.    OPR Standards

Because Mr. Elias was an Assistant United States Attorney, the Department of Justice's Office of Professional Responsibility ("OPR") has also already independently investigated his conduct.  In general, OPR's proceedings determine whether a government official or attorney committed "professional misconduct," exercised "poor judgment," made a "mistake," or did not violate any of these standards.  U.S. Dep't of Justice Office of Prof'l Responsibility:  Standard of Review (2019) (Exhibit 11); OPR Policies and Procedures, available at https://www.justice.gov/opr/policies-and-procedures (Exhibit 12).  OPR will presumably have applied the D.C. Rules in its investigation of Mr. Elias, and for the reasons discussed below, Mr. Elias's conduct provides a substantial basis for OPR to find intentional professional misconduct.

"Professional misconduct" under OPR standards requires a finding, by a preponderance of the evidence, that "[a] violation of an applicable legal obligation or professional standard" occurred and that "the violation was intentional, or resulted from the attorney's reckless disregard of the applicable obligation or professional standard." Exhibit 11. "Legal obligations" include those imposed by "the Constitution, statute, evidentiary or procedural rules, controlling case law, and local rules." *Id.* "Professional standards" are the "standards of conduct imposed by the attorney's licensing authority, the jurisdiction in which the attorney is practicing and Departmental regulations and policies." *Id.* "Poor judgment" means that the attorney engaged in a "a course of action that was in marked contrast to that which the Department would reasonably expect of an attorney exercising good judgment." *Id.* Finally, OPR may conclude that the attorney made a "mistake" when it determines that "that the attorney's conduct resulted from excusable human error despite the attorney's exercise of reasonable care under the circumstances." *Id.*

After its investigation is complete, OPR issues a report. Such reports do not appear to be public documents. Instead, OPR releases a summary of its investigation that includes the nature of the alleged misconduct and OPR's findings, but not the identity of the government lawyer involved. *See* Frequently Asked Questions, OPR (Oct. 16, 2019), https://www.justice.gov/opr/frequently-asked-questions (Exhibit 13); OPR Annual Report for 2018 at 14–30 (Exhibit 14) (selected summaries of OPR investigations).

If OPR finds that an attorney has committed professional misconduct, it sends its report to the Department's Professional Misconduct Review Unit (PMRU). Exhibit 12. The PMRU reviews OPR's report to determine if the professional misconduct findings are "supported by the evidence." *Id.* If so, PMRU makes a disciplinary recommendation based on input from the

United States Attorney regarding a list of considerations called the "Douglas factors," named after *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). *See* Exhibit 12; *see also* Exhibit 15 (non-exhaustive list of *Douglas* factors). The discipline imposed may be a reprimand, a suspension from work without pay of a specified duration, or termination of employment. Suspensions of more than 14 days can be appealed to the Merit Systems Protection Board. Exhibit 12. Suspensions of 14 days or less are appealable to the Office of the Deputy Attorney General. *Id.* OPR discipline is job-related and does not itself inhibit the ability of the attorney to practice law. Mr. Elias could practice law in New York or before this Court without impediment or perhaps even disclosure after being disciplined by the Department.

At the conclusion of the process, OPR will notify state bar authorities of misconduct findings involving a violation of a state bar rule, *id.*, and state bar authorities would then determine whether to commence a disciplinary proceeding against Mr. Elias. The only state bar that Mr. Elias belongs to is the New York Bar, Third Department. As a result, the referral would be to the Attorney Grievance Committee of the Third Department.

If a government attorney resigns during the course of an OPR investigation, OPR may still complete its investigation, but it does not appear that any discipline can be imposed. Exhibit 13. However, it is my understanding that, if OPR determines it appropriate to refer Mr. Elias to the bar disciplinary authorities, it can do so even though Mr. Elias has resigned.

### III.    Analysis of Mr. Elias's Conduct Under the Applicable State Bar Rules

For each of the three authorities relevant here, the substantive rules that will apply are the Rules of Professional Conduct promulgated by the District of Columbia Court of Appeals (the "D.C. Rules"). First, this Court's Committee on Grievances will apply the D.C. Rules because it has directly adopted those rules. *See* Local Criminal Rule 57.26(a). Second, New York will

apply the D.C. Rules because its choice-of-law rules direct that, when alleged misconduct occurred before a court, New York will apply the substantive rules of the court where the alleged misconduct took place. *See* N.Y Rules of Prof'l Conduct r 8.5(b)(1):

> In any exercise of the disciplinary authority of this state, the rules of professional conduct to be applied shall be as follows: (1) For conduct in connection with a proceeding in a court before which a lawyer had been admitted to practice (either generally or for the purposes of that proceeding), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise.

Finally, the D.C. Rules would be the "applicable rules of professional conduct" under OPR's procedures, as well. *See* Exhibit 12 at 3.

Because the D.C. Rules apply in all instances, I have evaluated Mr. Elias's conduct under those rules, and have concluded that his conduct violated multiple rules. First, the D.C. Rules prohibit false statements or misrepresentations to a court, and there is no dispute that Mr. Elias made false statements and misrepresentations here. Further, the context and effect of those statements supports a violation of the D.C. Rules separate prohibition involving dishonesty and misrepresentation. Mr. Elias made those false statements on the record; the government agreed that Mr. Elias made misrepresentations; and Mr. Elias himself admitted to making false statements to the Court in his letters of apology. Finally, I also conclude that Mr. Elias seriously interfered with the administration of justice, which represents a third separate violation.

### A.    D.C. Rule 3.3(a)(1)

D.C. Rule 3.3(a)(1) states that "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to a tribunal." A "tribunal" includes a court. D.C. Rule 1.0(n). "Knowingly" is defined to mean "actual knowledge of the fact in question" which "may be inferred from the circumstances." *Id.*

Here, Mr. Elias made a number of knowing false statements, including: "We went back to DFS, talked to them, told them about the Court's [March 28th] order, that the records should be turned over by yesterday;" "the backlog was the issue for DFS;" "And the government told DFS about this court order, and DFS did scramble to get this together;" and "The Government was unable to turn over the [drug test] results on April 8, 2019, due to confusion and backlog at the DFS." Exhibit 5. Mr. Elias admitted those statements were false, conceding in his letters of apology (Exhibit 9) that he did not contact DFS to inform it of the Court's March 28th Order, and that his misstatements to the Court were knowingly made: "I went into Court on April 9, 2019, with the intention of admitting to my oversight. When I realized that counsel for the defendant rightfully was seeking to exclude the evidence, I panicked and made a series of misrepresentations." Exhibit 9 at 4. The rest of the record also provides uncontradicted support that Mr. Elias made false statements to the Court. Jennifer Smith, the Director of DFS, stated that DFS "had no communication about the hearing on March 28th nor the requirement for the evidence to be processed by the April 8th date." Exhibit 8. Likewise, the government's letter to the Court dated May 31, 2019 stated that "AUSA Elias had admitted that he never communicated with DFS regarding the [March 28th] Order," and added that the "government has no information to suggest that DFS had a 'backlog' at the time AUSA Elias made that representation to the Court."

The authority on this issue is simple. Intentional misstatements of material fact to a Court violate Rule 3.3(a)(1). *See In re Samad*, 51 A.3d 486, 489, 497 (D.C. 2012) (Rule 3.3(a)(1) violated when a lawyer, asked about his availability by a judge, stated that he was "in trial" or "completing a trial" when the truth was that "evidentiary portion of the trial had concluded and the jury had begun deliberations"); *In re Robbins*, 911 A.2d 1227, 1227–28 (D.C.

2006) (false representation to trial court that settlement negotiations had been begun when seeking an extension of time violated both Arizona and D.C. Rules 3.3(a)(1)); *In re Owens*, 806 A.2d 1230 (D.C. 2002) (Rule 3.3(a)(1) violated when lawyer made false statements to cover up her attempted eavesdropping in violation of sequestration order).

## B.   D.C. Rule 8.4(c)

D.C. Rule 8.4(c) states that "[i]t is professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Generally speaking, "[d]ishonesty, fraud, deceit, and misrepresentation are four different violations." *In re Romansky*, 825 A.2d 311, 315 (D.C. 2003). These terms "should be understood as separate categories, denoting differences in meaning or degree." *In re Shorter*, 670 A.2d 760, 767 (D.C. 1990). Where "an action is obviously wrongful and intentionally done, the performing of the act itself is sufficient to the requisite intent for the violation." *Romansky*, 825 A.2d at 315. "Dishonesty" is a broad term, encompassing the other three, plus "conduct evincing a 'lack of honesty, probity or integrity in principle: [a] lack of fairness and straightforwardness.'" *Shorter*, 570 A.2d at 768; *see also In re Wilkins*, 649 A.2d 557, 561 (D.C. 1994) ("what may not be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty").

I conclude Mr. Elias violated the dishonesty, deceit and misrepresentation prongs of D.C. Rule 8.4(c) based on the same evidence that shows he violated Rule 3.3(a)(1). For Rule 8.4(c), however, it is particularly significant that Mr. Elias made multiple false statements at the April 9 hearing, and then made a further false statement *in writing* in the April 15 Motion to Dismiss (DE 22). Then on April 30, during a lengthy hearing, Mr. Elias failed to correct his false statements and let his unwitting colleague (Ms. Cheung) and the Court consider the issue of whether prejudice should attach to dismissal based on false premises:

THE COURT: Through no fault of the prosecutor the chemist didn't comply with the court order, right?

MS. CHEUNG: So, Your Honor, sometimes I think the Government is beholden to a lot of -- obtaining the analysis back. I think the Court made its ruling based upon the Government's failure to have that analysis back in time. I think the sanction was the Government's inability to use the results once they did come back.

Exhibit 6 at 43:19–44:1.

The Court's May 14, 2019 Memorandum Opinion repeated—again unwittingly—the same false facts provided by Mr. Elias: "As for the drug testing results, the government stated that it was unable to turn over the results due to 'confusion and backlog' at the testing agency." DE 39 at 6 (Mem. Op.). Under the jurisprudence of Rule 8.4, a violation can be found when a false statement is knowingly made. When, however, the false statement becomes the premise for subsequent proceedings and the lawyer stands silent, the violation is a continuing one, particularly where the false statement is repeated and relied upon by courts or other lawyers.

Mr. Elias has admitted to making misrepresentations to the Court in his letter of apology, providing the true facts (that he forgot to inform DFS of the April 8th deadline) and explaining that he came to the April 9th hearing intending to admit his "oversight" but "panicked" and "made a series of misrepresentations." DE 46 at 4. In sum, the evidence of a violation or multiple violations of D.C. Rule 8.4(c) is also compelling and seemingly undisputed.

### C.    D.C. Rule 8.4(d)

D.C. Rule 8.4(d) states that a lawyer shall not "engage in conduct that seriously interferes with the administration of justice." The elements of an 8.4(d) violation are (1) the attorney acted improperly; (2) the improper conduct directly related to a pending case; and (3) "the conduct 'taint[ed] the judicial process in more than a *de minimus* way,' meaning that it 'at least potentially impact[ed] upon the process to a serious and adverse degree.'" *In re White*, 11 A.3d 1226, 1230 (D.C. 2011); *see also In re Yelverton*, 105 A.3d 413, 425 (D.C. 2014); *In re*

*Uchendu*, 812 A.2d 933, 940 (D.C. 2002) ("Rule 8.4(d) is 'a general rule that is purposely broad

to encompass derelictions of attorney conduct considered reprehensible to the practice of law.'").

Violations of Rule 8.4(c) with respect to conduct before a tribunal may also violate Rule 8.4(d).

*In re Vohra*, 68 A.3d 766, 783 (D.C. 2013) (filing applications with forged signatures violated

Rule 8.4(c) and Rule 8.4(d)). Misleading the court is also an 8.4(d) violation. *Yelverton*, 105

A.3d at 426 ("We have found a broad range of conduct to violate Rule 8.4(d), but violations

generally involve misleading the court or misusing or obstructing proceedings in a specific case .

. .").

Here, the impact on the Court of Mr. Elias's misrepresentations is not *de minimus*. When

the Court excluded the results of testing done on the alleged drugs, it expressly noted that the

testing lab was at fault, and implied that the Court may have considered a motion that explained

the lab's "backlog." *See* Exhibit 5 at 21:19–23 ("If [the testing lab] had that problem [i.e., was

overworked], they should have filed some sort of motion."). The Court's reliance on Mr. Elias's

misrepresentations to explain its reasoning supports finding a serious interference with the

administration of justice. Likewise, when the Court found that prejudice would attach to the

indictment's dismissal, it relied on Mr. Elias's further *written* false statement that the testing lab

was at fault for the failure to meet the Court's deadline—and indeed repeated Elias's

misstatements in its written memorandum. The Court remained unaware of the falsity of Mr.

Elias's statements here for a significant period, holding two oral arguments during which Mr.

Elias's statements remained uncorrected. Those false statements negatively affected the work of

the Court, and so support finding a violation of Rule 8.4(d).

Likewise, the use of Court and other resources occasioned by Mr. Elias's conduct also

was more than *de minimus*. The Court had to hold a special hearing on July 25, 2019 solely to

address Mr. Elias's misstatements and their effects. Among other things, the Court spent that hearing ensuring that the public record was correct as to what communications DFS actually received and obtaining an accurate timeline of events. Senior members of the U.S. Attorney's Office had to become involved and conduct an internal review, and have filed numerous reports with the Court. That use of resources, necessary only because of Mr. Elias's conduct, represents another serious interference with the administration of justice. *See, e.g., In re Spikes*, 881 A.2d 1118, 1126–27 (D.C. 2005) (finding 8.4(d) violation based on filing of unfounded defamation action which inter alia, "tied up senior attorneys of the District of Columbia Government").[5]

Note that a disciplinary authority might find that Mr. Elias's failure in the first place to inform the drug testing lab about the court-ordered deadline also seriously interfered with the administration of justice. That failure was, after all, the first cause of the exclusion of drug test evidence in this case. But nothing in the record suggests that that conduct was intentional, and the Court never considered whether it would have necessitated exclusion of the relevant evidence. In my view, therefore, it does not itself rise to the level of a Rule 8.4(d) violation. By contrast, Mr. Elias's intentional and uncorrected misstatements represent actions that are beyond mere accidental error, and constitute much clearer violations of the rule.

## IV.    Recommendation

I recommend that the Court refer this matter for investigation by the Third Department of the Appellate Division in New York, through its Attorney Grievance Committee. In support of

---

[5] A disciplinary committee could consider whether Mr. Elias violated D.C. Rule 3.4(a) which prohibits obstruction of another party's access to evidence and 3.4(c) which prohibits a lawyer from knowingly "disobey[ing] an obligation under the rules of a tribunal." Similarly, a disciplinary committee could consider whether Mr. Elias's failure to inform the lab of the April 8 deadline violated Rule 1.3 (diligence). At most, in my view, these provisions are in the context of this matter cumulative of the other rules discussed in this Report and Recommendation.

its referral, the Court can send that Committee a copy of this Report and its exhibits.  The Court can also send a copy of the OPR Report, if and when available.

I recommend this because, first, I conclude there are clear and material rule violations here.  Because of that, I believe the proper course is to refer the matter for adjudication without any delay.  The evidence concerning Mr. Elias's conduct is documented and undisputed: the record contains written admissions by Mr. Elias, made after consultation with counsel, that he made intentional false statements.  Further, the transcripts of the hearings on March 28, April 9, April 30, and July 25, 2019 and the government's letters to the Court dated May 23 and May 31, 2019 provide the context and the additional facts necessary to provide a thorough and reliable account Mr. Elias's conduct and intent.  It is preferable for all involved for this matter to be resolved promptly, and the later the referral is made, the later disciplinary authorities will commence their investigation.

Second, as to who or what body should make the referral, I recommend that that the Court itself make a referral, even if OPR or some other body also makes a referral.  Mr. Elias failed to comply with this Court's Order, and then made misrepresentations about the non-compliance directly to this Court.  These circumstances—unlike other instances where, for example, the government allegedly failed in its disclosure obligations to defense counsel or is accused of misconduct with respect to a witness—involve this Court directly.  It is therefore wholly appropriate for the Court itself to make a referral to the disciplinary authorities.

Finally, with respect to the body to which the Court should make the referral, I recommend that the Court refer the matter to the New York, Third Department disciplinary authorities.  As a threshold matter, Mr. Elias is not a member of the D.C. Bar, so that body has no jurisdiction over him, and the Court cannot refer him to the D.C. Office of Disciplinary

Counsel. The other body that the Court could ask to consider Mr. Elias's conduct in the first instance is this Court's own Committee on Grievances. That body could investigate Mr. Elias's conduct and, if it found violations, bring charges that would be adjudicated before this Court's Disciplinary Panel. Any discipline imposed by this Court would have its effect only in this Court, unless and until other bodies imposed reciprocal discipline.

The foundation of Mr. Elias's ability to practice law is his New York State Bar admission. As a result, the most direct way to assess Mr. Elias's conduct for the purposes of discipline and his ability to continue to practice law is to refer this matter to the New York bar authorities. Mr. Elias's ability to practice law outside of this Court is based upon his New York admission and, as a result, referral to the New York disciplinary authorities in the first instance is the most direct way to determine if Mr. Elias should be disciplined and, if so, what discipline is appropriate. And even though Mr. Elias's practice has been in the District, his New York license makes him fundamentally a New York lawyer, which means that New York has a direct interest in the matter.

Finally, the Court could refer the matter *both* to this Court's Committee on Grievances and the New York authorities. I do not believe that is necessary, and it could in fact slow the process by creating confusion. It might also create an unnecessary burden on Mr. Elias if he had to respond to multiple concurrent investigations.

I remain available to the Court to supplement this Report and Recommendation upon the Court's request.

Dated: November 15, 2019                    Respectfully submitted,

Thomas B. Mason
D.C. Bar No. 413345
Harris Wiltshire & Grannis LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
(202) 730-1300
Fax (202) 730-1301
tmason@hwglaw.com